# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 14, 2023 Session

## KENDALL COLLIER EX REL. CHAYCE C. v. PERICLIS ROUSSIS, M.D., ET AL.

### Appeal from the Circuit Court for Knox County
### No. 2-562-12    William T. Ailor, Judge

---

### No. E2022-00636-COA-R3-CV

---

This appeal concerns juror misconduct. Chayce Collier ("Chayce"), a minor, by and through his parent and next friend, Kendall Collier ("Plaintiff"), sued Periclis Roussis, M.D. ("Dr. Roussis"), Fort Sanders Perinatal Center, and Fort Sanders Regional Medical Center ("the Hospital") ("Defendants," collectively) in the Circuit Court for Knox County ("the Trial Court") alleging health care liability in Chayce's delivery. A major issue at trial was whether Dr. Roussis fell below the standard of care by failing to administer epinephrine to Plaintiff when she had an anaphylactic reaction during labor. The jury found for Defendants. However, it emerged that a juror had gone home and looked at the warning on an epipen which said that epinephrine should only be used when the potential benefit justifies the potential risk to the fetus. The juror shared this information with the rest of the jury. Plaintiff filed a motion for a new trial, which the Trial Court first granted and then denied. Plaintiff appeals. Under Tenn. R. Evid. 606(b), jurors may not be asked what effect, if any, that extraneous information had on them. Instead, courts look to the extraneous information itself to determine whether there is a reasonable possibility that it altered the verdict. We hold that there is a reasonable possibility that the extraneous information shared with the jury in this case altered the verdict, and Defendants failed to rebut the presumption of prejudice. The Trial Court applied an incorrect legal standard and thereby abused its discretion in denying Plaintiff's motion for a new trial. We reverse the judgment of the Trial Court and remand for further proceedings consistent with this Opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Joe Bednarz, Sr. and Joe Bednarz, Jr., Hendersonville, Tennessee, for the appellant, Chayce Collier, a minor, by and through his natural parent and next friend, Kendall Collier.

Raymond G. Lewallen, Jr., Knoxville, Tennessee, for the appellee, Periclis Roussis, M.D.

Rick L. Powers and Rachel P. Hurt, Knoxville, Tennessee, for the appellees, Fort Sanders Perinatal Center and Fort Sanders Regional Medical Center.[1]

## OPINION

## Background

In June 2009, Plaintiff was admitted to the Hospital in connection with her pregnancy. Plaintiff tested positive for Strep B and was given ampicillin. Plaintiff had a major anaphylactic reaction. Dr. Roussis arrived and documented his observations, writing in part:

> Called to see patient because of SOB [shortness of breath]. . . . She is cyanotic with difficulty breathing. . . . BP [blood pressure] 140/95. P [pulse]:150-155 in severe distress. . . . Patient was on O2. In view of this [reaction] patient given Benadryl and solu-medrol IV and SQ brethine[.] No epi pen on floor at that time. . . . By 10:55, patient was doing better. . . .

Plaintiff later gave birth to Chayce, who suffered from brain damage. In October 2012, Plaintiff sued Defendants in the Trial Court alleging health care liability in Chayce's delivery. The case was tried by jury.

In 2015, the jury returned a verdict in Defendants' favor and the Trial Court entered judgment for Defendants. On appeal, in *Collier v. Roussis*, No. E2016-01591-COA-R3-CV, 2017 WL 3382801 (Tenn. Ct. App. Aug. 7, 2017), *perm. app. denied Dec. 6, 2017* (designated not for citation), we vacated the Trial Court's judgment and remanded for a new trial.

On remand, the case was again tried before a jury, this time from July 8, 2019 through July 22, 2019. A central issue was whether Dr. Roussis fell below the standard of care in treating Plaintiff by failing to administer epinephrine—a drug used to treat anaphylactic reaction. Defendants' experts testified that one must weigh the risks and benefits before administering epinephrine. According to Defendants, it was within the

---

[1] Defendants share a common brief.

standard of care for Dr. Roussis to exercise his judgment and elect not to administer epinephrine under the circumstances. Plaintiff's experts acknowledged the general need to weigh the risks and benefits but that, in cases of anaphylactic reaction such as that suffered by Plaintiff, the benefits of epinephrine always outweigh the risks. For example, Dr. H. James Wedner, an expert for Plaintiff, testified:

Q. Doctor, I don't think I've asked you this question, but what is the treatment for anaphylaxis?
A. The treatment for anaphylaxis is epinephrine.
Q. Always?
A. Always.
Q. Are there any absolute contraindications to the use of epinephrine?
A. No.

***

Q. Doctor, do you have an opinion to a reasonable degree of medical certainty whether Dr. Roussis violated the standard of care in his care and treatment of Kendall Collier?
A. I think he should have used epinephrine.
Q. Was that a violation of the standard of care not to do so?
A. Yes.
Q. Doctor, in terms of the treatment of anaphylaxis in the administration of epinephrine, does it matter whether the blood pressure dropped or not?
A. No.
Q. Why not?
A. Remember that we said in order to make a diagnosis, you need two organ systems. In this case, we've had more than that.
There are two reasons that we don't wait for the blood pressure to drop. It may drop and it may drop later, and you don't want that to happen. So by early administration of epinephrine, you literally prevent the blood pressure from dropping if it hasn't.
So you don't wait. What we say about epinephrine is, if you think you should have used epinephrine, you should already have given it. So you don't wait for the symptoms to mature. You don't wait for the blood pressure to drop. You don't wait for them to have skin symptoms. If you make a diagnosis, you treat the patient right then and there.

***

Q. On cross-examination, you agreed that epinephrine should only be used when the benefits outweigh the risk.
A. That's correct.
Q. Is that true with all drugs?
A. Every drug.
Q. How often do the benefits outweigh the risk when you're talking about the administration of epinephrine when faced with anaphylaxis?
A. Always.

Dr. Jerry L. Epps, an expert witness for Defendants, gave an opposing view. He testified that the decision to administer epinephrine for an anaphylactic reaction is not necessarily so clear-cut:

Q. The jury has heard about epinephrine in this case. Could you tell the jury your opinion on whether epinephrine would always be the drug of choice for a pregnant, laboring patient who has an anaphylactic reaction?
A. So I think that you have to make a distinction about the use of epinephrine in a couple senses.

One is that there's no question epinephrine is the drug of choice for someone with a severe anaphylactic reaction manifested by a decrease in blood pressure. It's that reason -- for two reasons. One is that epinephrine increases the strength of the contraction of the heart. It also causes blood vessels to constrict, which raises the blood pressure.

Even more so, epinephrine will treat the reason why you're having the anaphylactic reaction. So with anaphylaxis, there are certain cells found in your body. There's mast cells, which are out around the cells themselves, and basophils, which are actually in the blood system. They have what we call granules inside them. Those granules have the mediators, the substances that caused anaphylaxis to occur, and there's a multitude of substances that are released when that occurs. Epinephrine stabilizes these granules and prevents them from being released.

The problem with epinephrine is, is that it is not a drug that you can give at liberty. It has risks associated with it. As physicians, our goal is to assess risks and benefits and make an informed decision based on the clinical presentation at the time when we evaluate a patient as what to do next.

\*\*\*

[E]pinephrine has serious side effects when given through intravenous means or even intramuscular means, and that means it can cause your blood pressure to go exceedingly high. I've seen it go as high as 350 torr in that standpoint.

-4-

It can cause your heart to have a heart attack. It can cause your blood vessels to dissect. It can cause your brain to have a bleed in that circumstance. There's just a multitude of problems that epinephrine can cause.

At trial's end, the jury returned a verdict in favor of Defendants. Plaintiff subsequently filed a motion for a new trial. Plaintiff asserted, among other things, that juror misconduct had occurred. In support of her motion, Plaintiff attached as exhibits to her memorandum of law the affidavits of jurors Joe Mynatt ("Mynatt") and David Woods ("Woods"). In his affidavit, Mynatt stated:

> I, Joe Mynatt, after being duly sworn, hereby depose and state as follows:
> 1. That I served as a juror in the case described above.
> 2. That during our deliberations, a fellow juror, juror No. 8, Zachary Jacobsen, shared with the other jurors that he had gone home over the weekend and looked at the warnings on Epipens.
> 3. Mr. Jacobsen, shared with us information on those warnings. He said that the Epipen stated that caution should be used during pregnancy and that epinephrine should only be used when the potential benefit justified the potential risk to the fetus.

Woods stated much the same in his affidavit.

The Trial Court initially granted Plaintiff's motion for a new trial. Defendants then filed a motion to alter or amend. It was, and is, Defendants' position that the information shared with the jury was nothing new or prejudicial so as to require a new trial. The Trial Court agreed with Defendants and entered an order this time denying Plaintiff's motion for a new trial. The Trial Court attached a transcript of its oral ruling to its order. In its oral ruling, the Trial Court stated as relevant:

> THE COURT: All right. In reviewing [Tenn. R. Evid.] 606(b), competency of a juror as a witness, inquiry into validity of verdict, the rule reads as follows. "Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberation or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental process, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion, nor may a juror's affidavit or evidence of any statement by the

-5-

juror concerning a matter about which the juror would be precluded from testifying be received for these purposes."

The Court, in reviewing case law cited by all of the parties and the statements that have been referred to in the record, looking at the case law, the case law seems to have been all over the map with regard to some of the interpretation of 606(b).

Clearly, in this case, the defendants have witnesses who testified with regard to the use of epinephrine in a pregnant patient, as well as the warnings that have been part of the medical literature concerning the use of epinephrine in pregnant patients. Also Dr. Wedner did testify that caution should be used in pregnant patients.

The use of epinephrine in this case is a central issue in this case. It is one of the most important issues that the jury had to decide. The defense offered its experts with regard to the concerns of using epinephrine in a pregnant patient. The plaintiff's experts testified that epinephrine was something that was the, as I recall, the gold standard in a patient in anaphylaxis.

In looking at Rule 606, it is clear that this juror did look at extraneous information, that being information outside of what was brought into the trial. However, that information clearly had been testified to by defense experts. Those warnings were not new.

So the next question is whether or not that information is prejudicial information. There is, from the Court's review of the affidavits, no testimony that this affected the jury in any way, and Rule 606(b) does not preclude the question to jurors as to whether or not that information affected them. The *Caldararo* court ruled that the standard is that prejudicial information must be proved by clear and convincing evidence.[2]

The Court's opinion with regard to this evidence would be that the evidence had to have an influence on the jury. However, the Court's opinion with regard to whether or not the plaintiffs have met the standard of clear and convincing evidence is that the plaintiffs have not met that burden. Therefore, the Court modifies its ruling with regard to that particular issue.

Plaintiff filed a motion to alter or amend, which the Trial Court denied. Plaintiff timely appealed to this Court.

---

[2] *Caldararo* does not mention clear and convincing evidence. *See Caldararo by Caldararo v. Vanderbilt Univ.,* 794 S.W.2d 738 (Tenn. Ct. App. 1990).

## Discussion

Plaintiff raises eight issues on appeal.[3]  However, we discern one dispositive issue: whether the Trial Court erred in denying Plaintiff's motion for a new trial on grounds of juror misconduct.

The denial of a motion for a new trial generally is reviewed for abuse of discretion. *Allen v. Albea*, 476 S.W.3d 366, 373 (Tenn. Ct. App. 2015).  In *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515 (Tenn. 2010), the Tennessee Supreme Court discussed the abuse of discretion standard at length, stating:

> The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.  *Beard v. Bd. of Prof'l Responsibility*, 288 S.W.3d 838, 860 (Tenn. 2009); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn. Ct. App. 2000).  It reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 708 (Tenn. Ct. App. 1999).  Thus, it does not permit reviewing courts to second-guess the court below, *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999), or to substitute their discretion for the lower court's, *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).  The abuse of discretion standard of review does not, however, immunize a lower court's decision from any meaningful appellate scrutiny. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 211 (Tenn. Ct. App. 2002).

> Discretionary decisions must take the applicable law and the relevant facts into account. *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996).  An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision.

---

[3] These are: (1) whether the Trial Court erred in failing to grant a new trial because of juror misconduct - bringing extraneous prejudicial information to the entire jury; (2) whether the Trial Court erred in allowing Defendants to "blame shift" without ever pleading comparative fault; (3) whether the Trial Court erred in granting partial summary judgment to Defendant Dr. Roussis with regard to the administration of Amoxicillin on June 1, 2009; (4) whether the Trial Court erred in allowing Nurse Hensley and Nurse Ott to testify; (5) whether the Trial Court erred in refusing to charge the jury regarding spoliation of evidence; (6) whether the Trial Court erred in unduly restricting fact witnesses' testimony relating to the use of blue blood pressure cuffs; (7) whether the Trial Court erred in refusing to charge the jury regarding the prior trial; and (8) whether the Trial Court erred in excluding evidence of pre-majority expenses.  (Format modified).

*State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007). A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence. *State v. Ostein*, 293 S.W.3d 519, 526 (Tenn. 2009); *Konvalinka v. Chattanooga-Hamilton County Hosp. Auth.*, 249 S.W.3d at 358; *Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W.3d [22,] 42 [(Tenn. 2005)].

To avoid result-oriented decisions or seemingly irreconcilable precedents, reviewing courts should review a lower court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions. *Flautt & Mann v. Council of Memphis*, 285 S.W.3d 856, 872-73 (Tenn. Ct. App. 2008) (quoting *BIF, a Div. of Gen. Signal Controls, Inc. v. Service Constr. Co.*, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988) (No Tenn. R. App. P. 11 application filed)). When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the lower court's legal determinations de novo without any presumption of correctness. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *Boyd v. Comdata Network, Inc.*, 88 S.W.3d at 212.

*Beecher*, 312 S.W.3d at 524-25.

Plaintiff asserts that the standard for proving juror misconduct is preponderance of the evidence, not clear and convincing evidence as stated by the Trial Court.[4] Defendants, on the other hand, argue that the standard is clear and convincing evidence. In a 2013 criminal case, the Tennessee Supreme Court engaged in a lengthy discussion concerning a jury's exposure to extraneous information:

In *Walsh* [*v. State*, 166 S.W.3d 641 (Tenn. 2005)], this Court settled any question as to the scope of inquiry permitted under Tennessee Rule of Evidence 606(b), explicitly holding that the rule "prohibits introduction of

---

[4] Plaintiff points out by way of contrast that a petitioner in a post-conviction criminal setting has a clear and convincing burden of proof, but that is specifically provided for by statute. *See* Tenn. Code Ann. § 40-30-110(f).

juror testimony concerning the effect on the juror of an improper communication . . . during jury deliberations." 166 S.W.3d at 643. The terms of the rule therefore prohibit the State from introducing what might otherwise be perceived as the most relevant evidence to rebut the presumption of prejudice—juror testimony as to whether the extraneous prejudicial information or improper outside influence actually had any effect on the verdict. While we acknowledge the limitations this presented to the State in its efforts to overcome the presumption, there are sound policy reasons for the exclusion of such proof.

***

We believe that the analysis in *Walsh*, as supplemented by a combination of the factor tests employed by the federal circuit courts of appeals, provides the proper framework for determining the probable, objective effect upon a verdict of a juror's exposure to either extraneous prejudicial information or an improper outside influence. In determining whether the State has rebutted the presumption of prejudice in circumstances such as these, trial courts should consider the following factors: (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial. No single factor is dispositive. Instead, trial courts should consider all of the factors in light of the ultimate inquiry—whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict. Applying these factors to the case before us, we find no reasonable possibility that the note received by the jury foreman altered the verdict.

***

As a final matter, because the right to a trial by an impartial jury is grounded in the federal and state constitutions, a trial court's analysis under Tennessee Rule of Evidence 606(b) should be reviewed by the appellate courts as a mixed question of law and fact. In consequence, this issue is subject to the de novo standard of review. The trial court's factual findings—such as the credibility and weight to be given a juror's testimony or the weight of the evidence presented at trial—should be reviewed de novo, accompanied by a presumption of correctness unless the evidence preponderates otherwise. However, the trial court's conclusions of law—

such as whether a jury's verdict was affected by extraneous prejudicial information or an improper outside influence—should be reviewed under a purely de novo standard, with no accompanying presumption of correctness.

*State v. Adams*, 405 S.W.3d 641, 651-54, 656 (Tenn. 2013) (footnotes and some citations omitted). Notably, *Adams* does not mention clear and convincing evidence in connection with juror misconduct and Rule 606(b). In 2015, in the wake of *Adams*, this Court discussed juror misconduct as follows:

It is well settled that a jury's verdict must be grounded on the evidence that was introduced at trial. *Patton v. Rose*, 892 S.W.2d 410, 413 (Tenn. Ct. App. 1994) (citation omitted). A verdict that is "based on something other than the evidence introduced at trial is improper and should not be allowed to stand." *Id.* "However, in order to be granted a new trial due to such jury misconduct, there must be admissible evidence on the issue." *Id.* Rule 606(b) of the Tennessee Rules of Evidence controls the admissibility of juror evidence. The Rule provides:

> **Inquiry Into Validity of Verdict or Indictment**. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

As a matter of law, juror testimony regarding the jury's deliberations, "including the juror's own internal thoughts, motivations, or emotions[,]" generally is not admissible. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005) (citations omitted). Rule 606(b) is based on the common-law rule prohibiting the admission of a juror's testimony to impeach the jury's verdict and on the common-law exception for testimony concerning extraneous

influences. *Id*. at 646 (citation omitted). It "promotes full and frank discussion in the privacy of the jury room and protects jurors from harassment by the losing party who might seek to impeach the verdict." *Id*. The "overarching purpose" of Rule 606(b) "is to protect the integrity of the jury's deliberative process." *Id*.

Under Rule 606(b), a juror may testify in order "to establish the *fact* of extraneous information or improper influence on the juror[.]" *Id*. at 649 (emphasis added). The Tennessee Supreme Court held in *Walsh*, however, that juror testimony "concerning the effect of such information or influence on the juror's deliberative processes" is not admissible. *Id*. Additionally, we have held that a trial court abuses its discretion when it admits juror testimony regarding the effect of extraneous information on the jury's decision-making process. *Gaines v. Tenney*, No. E2008-02323-COA-R3-CV, 2010 WL 199628, at *2 (Tenn. Ct. App. 2010) (citing *Walsh*, 166 S.W.3d at 649).

"'[E]xtraneous information' is information from a source outside the jury." *Caldararo by Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 742 (Tenn. App. 1990) (citing *State v. Coker*, 746 S.W.2d 167, 171 (Tenn. 1987)). The *Caldararo* court noted:

> External influences that could warrant a new trial *if found to be prejudicial* include: (1) exposure to news items about the trial, (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case. Internal influences that are not grounds to overturn a verdict include: (1) discussions among jurors, (2) intimidation or harassment of one juror by another, (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions.

*Id*. (emphasis added) (internal citations omitted). Thus, a juror's notes taken during trial, for example, are not considered extraneous information and use of such notes during jury deliberations is not considered outside influence. *Id*. at 743. Additionally, while a juror's personal experiences that are unrelated to the litigation do not constitute external information, a juror's personal experiences that relate directly "to the parties or to the events directly involved in the litigation may[.]" *Id*. at 744 (citations omitted). "[E]xtraneous information could enter the jury room through the mouth of a juror[ ]" if, for example, the juror conducts independent research or performs

his own tests. *Id*. n.7 (citation omitted). "[T]he effect of anything upon any juror's mind or emotions" is not admissible, however. *State v. Adams*, 405 S.W.3d 641, 651 (Tenn. 2013) (quoting Tenn. R. Evid. 606(b)). Pressure and intimidation by other jurors also are not extraneous information or outside influence. *State v. Hailey*, 658 S.W.2d 547, 553 (Tenn. Crim. App. 1983).

The party seeking a new trial on the ground of juror misconduct bears the burden of proving misconduct by a preponderance of the evidence. *Worley v. Rarity Communities, Inc.*, No. M2012-01373-COA-R3-CV, 2013 WL 3958444, at *1 (Tenn. Ct. App. July 29, 2013) (perm. app. denied Dec. 11, 2013). In this case, that portion of Mr. Lofton's affidavit regarding Mr. Pinson's statement to the jury is admissible with respect to the fact of alleged extraneous information. However, that portion of his affidavit with respect to the effect, or intended effect, of that information is not admissible. See *Walsh*, 166 S.W.3d at 649.

*Allen*, 476 S.W.3d at 374-76; *see also Parker v. Epstein Enterprises, LLC*, No. W2019-00311-COA-R3-CV, 2020 WL 2731234, at *15 (Tenn. Ct. App. May 26, 2020), *no appl. perm. appeal filed* ("The party seeking a new trial on the ground of juror misconduct bears the burden of producing admissible evidence 'proving misconduct by a preponderance of the evidence.'" (quoting *Allen*, 476 S.W.3d at 376)). In *Allen*, we concluded:

[T]he issue presented by this appeal is whether the juror misconduct alleged by Mr. Allen provided the jury with extraneous information that was prejudicial to Mr. Allen. Notwithstanding Mr. Pinson's disregard of the trial court's instructions, Mr. Pinson introduced no information not already placed before the jury by Mr. Allen. Thus, Mr. Pinson's statement did not constitute "extraneous prejudicial information" under Rule 606(b). Further, in light of the totality of the evidence, we find no reasonable possibility that Mr. Pinson's statement altered the verdict. Accordingly, we find no error on the part of the trial court and affirm its denial of Mr. Allen's motion for a new trial.

*Allen*, 476 S.W.3d at 377.

In another case from this Court addressing juror misconduct, we articulated the approach this way:

Denim & Diamonds relies upon the extraneous prejudicial information exception found in Rule 606(b) to question the verdict. The burden of introducing evidence sufficient to support a finding that Rule

606(b) has been satisfied rests with Denim & Diamonds. *State v. Stinnett*, 958 S.W.2d 329, 330 n. 5 (Tenn. 1997). If this burden is met, then a rebuttable presumption of prejudice arises and the burden shifts [to] the other party to explain the conduct or demonstrate it was harmless. *Walsh*, 166 S.W.3d at 647.

*Collins v. Arnold*, No. M2004-02513-COA-R3-CV, 2007 WL 4146025, at \*31 (Tenn. Ct. App. Nov. 20, 2007), *perm. app. denied April 14, 2008*.

By contrast, in *Mayo v. Shine*, 392 S.W.3d 61, 65 (Tenn. Ct. App. 2012), this Court stated that the applicable standard is clear and convincing evidence: "'[C]lear and convincing evidence of prejudice is required to meet the standards of Tennessee Rules of Evidence 606(b),' and the burden is on the appellant to prove prejudice." (quoting *Whiteside v. Hedge*, No. E2004-02598-COA-R3-CV, 2005 WL 1248975, at \*3 (Tenn. Ct. App. May 26, 2005), *no appl. perm. appeal filed*).[5] The Court of Criminal Appeals has also cited *Whiteside* for this proposition. *See State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at \*31 (Tenn. Crim. App. April 8, 2020), *reversed on other grounds in State v Booker*, 656 S.W.3d 49 (Tenn. 2022).

We note the discrepancy in the caselaw as to the applicable burden of proof for juror misconduct vis-à-vis Tenn. R. Evid. 606(b). Defendants are correct in that cases like *Mayo* and *Whiteside* support clear and convincing evidence as the applicable standard. However, in 2013, the Tennessee Supreme Court in *Adams* did not mention clear and convincing evidence in connection with its extensive articulation of the law on juror misconduct and Rule 606(b). In the 2015 *Allen* case, this Court likewise engaged in a lengthy discussion on juror misconduct and never mentioned clear and convincing evidence. Meanwhile, *Whiteside* and *Mayo*, the chief cases supporting Defendants' position, are from 2005 and 2012 respectively. We conclude that, in the wake of *Adams* and more recent published caselaw, the burden of proof for a party alleging juror misconduct is preponderance of the evidence, not clear and convincing evidence. By holding Plaintiff to a clear and convincing evidentiary burden, the Trial Court applied an incorrect legal standard.

The Trial Court also stated that "Rule 606(b) does not preclude the question to jurors as to whether or not that information affected them." However, as shown in the authorities above and the rule itself, the opposite is the case. Jurors may not be asked what effect, if any, that extraneous information had on them. They can only be asked what information

---

[5] "Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992). Meanwhile, the preponderance of the evidence standard simply means proving something is more likely than not. *See Marks, Shell, & Maness v. Mann*, No. M2002-00652-COA-R3-CV, 2004 WL 1434318, at \*2 (Tenn. Ct. App. June 23, 2004), *no appl. perm. appeal filed*.

-13-

they received, not what effect it had. As a result, we are left to look to the alleged extraneous information itself to determine its possible impact on the verdict. Here, the information was shared with the whole jury during its deliberations. The information was thus broadly shared and shared at a crucial time in the jury's decision-making process. Defendants nevertheless argue that the information was inconsequential. Defendants' arguments focus on the content of the information at issue as well as the weight of the evidence adduced at trial. In their brief, Defendants state among other things that "these two affidavits [by Mynatt and Woods] do not establish that information was presented to the jury that was prejudicial or had an influence on the jury, **because this specific information had already been offered as evidence to the jury by no less than eight expert witnesses**." (Emphasis in original). Defendants state further that "the information allegedly conveyed by Mr. Jacobson was nothing new to the jury." (Emphasis in original). Finally, Defendants state that "the jury heard numerous times that caution should be used in administering epinephrine to pregnant patients and epinephrine can have adverse effects on a fetus."

Defendants do not dispute that Juror Zachary Jacobsen ("Jacobsen") did what the affidavits said he did. Instead, they argue that the information shared by Jacobsen was not prejudicial. In fact, Defendants go so far as to say that "[t]hese affidavits [by Mynatt and Woods] do not establish that Mr. Jacobson conducted independent research." We respectfully disagree. Jacobsen served on a jury in a case in which a central issue was a doctor's decision not to administer epinephrine in response to an anaphylactic reaction. Jacobsen and the other jurors were obliged to refrain from investigating the case on their own. They had to base their decision on the duly-admitted evidence from trial. Notwithstanding that, Jacobsen went home, looked at the warning on an epipen, and reported his observations to the jury. While not in-depth medical research by any stretch, this action nevertheless constituted independent research as the warning label on the epipen was not admitted into evidence. The warning "that caution should be used during pregnancy and that epinephrine should only be used when the potential benefit justified the potential risk to the fetus" could have swayed jurors to accept Defendants' position that it was consistent with the standard of care for Dr. Roussis to weigh the risks and benefits and decide in his judgment not to administer epinephrine to Plaintiff over Plaintiff's position that the benefits always outweigh the risk concerning giving epinephrine to a pregnant anaphylaxis patient.

Defendants are correct in that the jurors were presented with expert testimony at trial that there are risks and benefits to epinephrine and that caution should be used when administering it. That much is uncontroversial. Both sides agree that caution should be exercised when administering drugs as a matter of course. However, Plaintiff's experts testified that, irrespective of the general need to weigh the risks and benefits, the benefits of epinephrine always outweigh the risks when confronted with an anaphylactic reaction

-14-

such as that suffered by Plaintiff. The distinction is crucial and goes to the heart of the trial. If the standard of care required that Dr. Roussis administer epinephrine to Plaintiff to treat her anaphylactic reaction, the jury would have had a basis for finding in Plaintiff's favor. If, as Defendants contend, the issue was not so clear-cut, and Dr. Roussis could have adhered to the standard of care by exercising his judgment not to administer epinephrine, the jury could have found for Defendants. It was for the jury to decide this question based solely on the properly-admitted evidence before it. The extraneous information shared by Jacobsen likely polluted the jury's deliberations.

While Defendants argue that the extraneous information was nothing new, it was materially different from the testimony at trial. Since the extraneous information came from a warning on an epipen—a warning issued for general public consumption and unconnected to Plaintiff's lawsuit—the jury could have accorded it undue, added credence. The jury could have further viewed the warning as an unbiased source, or a tiebreaker. Thus, we disagree with Defendants' argument that the warning was nothing new. It was information not in evidence touching on a main issue at trial. In short, it was extraneous, presumptively prejudicial information. Clearly Jacobsen thought his new information relevant enough to tell the other jurors all about it. What is more, Plaintiff never had an opportunity to counter this information. The epipen warning, which on its face favored Defendants' position, went unanswered. We agree that the Trial Court had it right when it stated "[t]he Court's opinion with regard to this evidence would be that the evidence had to have an influence on the jury." While it was "information" and not "evidence," all that was required of Plaintiff on this point was to show that there is a "reasonable possibility" that this extraneous information altered the jury's verdict. It was incumbent upon Defendants to rebut the presumption of prejudice arising as a result of this extraneous information being shared with the jury. Defendants failed to rebut the presumption of prejudice or otherwise show that the information was harmless.

Plaintiff has successfully proven juror misconduct by a preponderance of the evidence. Even if the burden of proof were clear and convincing evidence as Defendants state, Plaintiff would have met that burden too because based on this record there is no serious or substantial doubt that Jacobsen shared what he is alleged to have shared with the jury. Under our "purely de novo standard" of review on the question of whether the jury's verdict was affected by the extraneous prejudicial information as required by the Tennessee Supreme Court in *Adams*, 405 S.W.3d at 656, we hold that there is a reasonable possibility that the extraneous information at issue altered the jury's verdict. We hold further that the Trial Court abused its discretion in denying Plaintiff's motion for a new trial.[6] We,

---

[6] We recognize the tension between the de novo element of the juror misconduct analysis and the abuse of discretion standard generally applied to motions for a new trial. Motions for a new trial are also granted or denied on grounds other than juror misconduct. Here, as relevant to the abuse of discretion standard, the Trial Court applied an incorrect legal standard by applying a clear and convincing evidentiary burden of

-15-

therefore, reverse the judgment of the Trial Court and remand for further proceedings consistent with this Opinion.[7]

### **Conclusion**

The judgment of the Trial Court is reversed, and this cause is remanded to the Trial Court for collection of the costs below and further proceedings consistent with this Opinion. The costs on appeal are assessed against the Appellees, Periclis Roussis, M.D., Fort Sanders Perinatal Center, and Fort Sanders Regional Medical Center.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

---

proof and in ruling that jurors may be asked whether extraneous information affected them. In addition, denying Plaintiff's motion for a new trial was not within the range of acceptable alternative dispositions in view of the reasonably possible effect of the extraneous information on the verdict.

[7] In view of our ruling that Plaintiff has proven juror misconduct and that the Trial Court abused its discretion in denying Plaintiff's motion for a new trial, Plaintiff's remaining issues are pretermitted. "It is well-settled that the role of the court is to adjudicate and settle legal rights, not to give abstract or advisory opinions." *Thomas v. Shelby Cnty.*, 416 S.W.3d 389, 393 (Tenn. Ct. App. 2011).